RICHARD ENGELKE ET AL. *v.* EUGENE WHEATLEY ET AL.

BALDWIN, C. J., KING, MURPHY, SHEA and ALCORN, Js.

Argued April 5—decided May 23, 1961

*Philip R. Shiff,* with whom was *Alan H. Shiff,* for the appellant (defendant Ellsworth Freight Lines, Inc.).

*Paul V. McNamara,* for the appellees (plaintiffs).

KING, J. Shortly before eleven o'clock in the evening of April 17, 1956, the named plaintiff was the operator of a convertible automobile in which his wife, the plaintiff Theresa, was a passenger in the front seat and the plaintiffs William and Elise Bodart, husband and wife, were passengers in the rear seat. The automobile had just been driven out of the premises of a drive-in theater, where the plaintiffs had attended a performance. The theater was on the north side of United States route 1, also known as Connecticut Avenue, in Norwalk. For a considerable distance in both directions, route 1, which ran generally east and west, was straight. The total width of the four concrete lanes was fifty feet, and on each outer side was an asphalt shoulder eleven feet wide. The named plaintiff, on leaving the theater premises, made a left turn to go easterly along route 1. He had crossed the middle of the highway and was in the most southerly lane head-

ing east when his car collided with a commercial motor vehicle, hereinafter referred to as a truck, consisting of a tractor and a semitrailer. The truck was being operated westerly on route 1 by the defendant Wheatley. For injuries and losses caused by this collision, the four plaintiffs brought this action. Although the owner of the drive-in theater and Edward Ryan, one of its employees, were also parties defendant, judgment was rendered in their favor and the present appeal does not concern them. Judgment in favor of each of the four plaintiffs was rendered against Wheatley, who owned the tractor, and against the defendant Ellsworth Freight Lines, Inc., hereinafter referred to as Ellsworth, which had hired the semitrailer from its owner, Mercury Freight Lines, Inc., hereinafter referred to as Mercury. From the judgment Ellsworth, alone, has appealed. While there are several grounds of appeal, that which is stressed and, if sustained, would be dispositive is that the court was in error in holding that Ellsworth was liable for any negligence of Wheatley in the operation of the truck at the time in question. The corrections and clarifications Ellsworth is entitled to in the finding are incorporated in the statement of facts.

The complaint predicated Ellsworth's liability on three grounds. The first was that Wheatley was operating the truck as the servant, agent or employee of Ellsworth. By amendment, an additional allegation was made that Wheatley was driving the truck as an independent contractor for Ellsworth, which was a common carrier operating under a certificate issued by the interstate commerce commission. By a third amendment, still another allegation was made—that Wheatley was operating the truck under an arrangement whereby he and

Ellsworth would share the profits from the trip in the course of which the collision occurred.

A carload of eggs had arrived from St. Paul at the Ellsworth freight terminal in Chicago. This delivery had been made by Mercury in its semi-trailer. At Chicago, the eggs were left in the trailer, to be carried by Ellsworth to the eastern seaboard. While Wheatley hauled for common carriers, he had no certificate from the interstate commerce commission. Both Ellsworth and Mercury were common carriers of freight by motor truck in interstate commerce, pursuant to the authority of the interstate commerce commission (49 Stat. 543, as amended, 49 U.S.C. §§ 301-327) and the public utilities commissions of various states. On March 24, 1956, Wheatley and Ellsworth executed a writing, hereinafter referred to as a lease, which purported to cover the rental, to Ellsworth, of Wheatley's tractor. Whether because of carelessness or by design, the blanks in the printed form of the lease were so imperfectly filled out that the instrument on its face fails to state any complete agreement of lease of the tractor. It did provide that the term of the lease should be one month, beginning March 24, 1956, at 12:45 p.m., and that it covered one trip from Chicago to the eastern seaboard and return. A so-called manifest, nowhere specifically referred to in the lease, was filled out by Ellsworth in type-writing under date of April 13, 1956. It, also, is far from a model of clarity. It does indicate that Wheatley, termed the "driver," left Chicago with 843 cases of eggs, designated lots of which he was to deliver to "LOL," as consignee, in Springfield, Massachusetts; New Haven, Connecticut; Providence, Rhode Island; and Cambridge, Massachusetts.

The lease, on its face, was not a complete integra-

tion of the agreement between Wheatley and the defendant, and therefore parol evidence of the terms of that agreement not inconsistent with, but in amplification of, the lease itself was properly and necessarily considered, as was the manifest. *Cohn* v. *Dunn,* 111 Conn. 342, 346, 149 A. 851; *Harris* v. *Clinton,* 142 Conn. 204, 210, 112 A.2d 885. In so far as the lease contained applicable mutual agreements of the parties, these formed a part of the contract between them. Further oral arrangements were made, especially as to the return trip, as hereinafter more particularly noted. The lease clearly was not a one-way trip lease but a lease for one way "and return." It provided that it did not cover "a power unit [tractor] when disengaged from the semi-trailer carrying the cargo herein identified." Actually, no cargo was "herein identified." The lease also contained a provision that it did not cover "any use of . . . [Wheatley's] vehicle [tractor] . . . intended by the parties to be used to transport the cargo herein identified [and none was identified], where such vehicle use is not in the productive use to the interest of [Ellsworth]."

Prior to Wheatley's departure from Chicago, Ellsworth did not know whether it would have any return load or not, and Wheatley understood that and also that Ellsworth was under no obligation to furnish him with a return load. The manager of Ellsworth in Chicago instructed Wheatley that on completion of delivery of the eggs, that is, in Cambridge, he was to call Ellsworth's solicitor in Boston for a load, and if there was none, he was to get a load in the usual way. That meant, as it had in the past on similar trips when Ellsworth had no return load, that Wheatley was to try to secure a load from anyone he could.

Beginning in January, 1955, Wheatley had done similar hauling jobs for Ellsworth from time to time, using, and personally operating, his Autocar diesel tractor, which was registered in Maryland, where he lived. On the trip in question, Ellsworth had to pay Mercury, for use of the semitrailer after the first ten days, a daily charge of $10. Wheatley, by his agreement with Ellsworth, was due back in Chicago within ten days of the time he left. If he carried a return load, he was obligated to pay Ellsworth, as trailer rental, 20 per cent of the freight charge. That charge was to be fixed by Wheatley. When he left Chicago, as well as at the time of the accident, his tractor displayed Ellsworth's interstate commerce commission and public utilities commission license numbers, and the semitrailer displayed Mercury's corresponding license numbers.

After the uneventful delivery of the last of the eggs, Wheatley, in accordance with his instructions, called Ellsworth's solicitor in Boston to see about a return load. Ellsworth sometimes had chocolate to be hauled from east to west. This time, however, Wheatley was told that Ellsworth had no return load of its own and he was to load for anyone he could. Wheatley made telephone calls to various companies in an endeavor to secure a return load. He finally succeeded in getting a load of fifteen tons of potatoes for delivery in Baltimore for a freight charge of about $100. Ellsworth maintained a terminal at North Bergen, New Jersey, a prime function of which was to supply loads to westbound trucks. It had no terminal in Boston. Before starting for Baltimore, Wheatley called the dispatcher at the North Bergen terminal, which was the nearest terminal to Boston Ellsworth had, and informed

him that he had accepted the potato shipment for Baltimore. The dispatcher approved. The accident occurred as Wheatley was hauling the potatoes from Boston to Baltimore. There is no claim that he was not then on a direct route between those two cities.

In § 428 of the Restatement of Torts, it is stated that "[a]n individual or a corporation carrying on an activity which can be lawfully carried on only under a franchise granted by public authority and which involves an unreasonable risk of harm to others, is subject to liability for bodily harm caused to such others by the negligence of a contractor employed to do work in carrying on the activity." We hold this rule applicable to a commercial motor vehicle such as this truck, except that we do not decide, nor is it necessary that we should decide, that the operation of such a common instrumentality as a commercial motor vehicle of which the component parts are a tractor and semitrailer necessarily involves an "unreasonable" risk of harm to others. With respect to such a motor vehicle, we adopt the rule without the characterization of the risk of harm as "unreasonable." That there is a very considerable risk of harm to others in the carriage of freight over the highways in such a motor vehicle is obvious. *Barry* v. *Keeler,* 322 Mass. 114, 127, 76 N.E.2d 158. The franchise rule imposes liability on Ellsworth for any negligence of Wheatley in the operation of the truck in the performance, in whole or in part, of Ellsworth's business under its interstate commerce commission certificate, regardless of whether the terms of the contract between Ellsworth and Wheatley created, not merely a pure independent contractor relationship, but such a relationship implemented by vehicular

leases. Nearly seventy years ago, we applied the franchise rule to railroads, where the relationship between them was predominantly that of lessor and lessee, in *Driscoll* v. *Norwich & W. R. Co.*, 65 Conn. 230, 251, 32 A. 354. The rule was shortly thereafter reaffirmed in *Murray* v. *Lehigh Valley R. Co.*, 66 Conn. 512, 519, 34 A. 506. In neither of these cases was it held that the rule was based on any theory that the running of a train was an activity involving "an unreasonable risk of harm to others." Rather, it was based on the nondelegability of the obligations assumed by a common carrier in its acceptance of a franchise from public authorities.

Here, the carriage of the eggs was done by virtue of Ellsworth's common carrier certificate from the interstate commerce commission. Since Ellsworth knew that Wheatley had no such certificate, it caused its own interstate commerce commission and public utilities commission markers to be affixed to Wheatley's tractor. Ellsworth seems to concede that it could have been found liable for any actionable negligence of Wheatley occurring on the eastbound trip. This would be so under the franchise rule, since Ellsworth was carrying on its own business as a common carrier through a contract with Wheatley which was implemented by a lease of his tractor with himself as operator. But Ellsworth denies liability for any negligence of Wheatley on the Boston to Baltimore trip, because, Ellsworth claims, he was then engaged, not in Ellsworth's business, but exclusively in his own business, the semitrailer was then being rented to him by Ellsworth, and he was traveling a route entirely of his own choosing. In support of this claim, Ellsworth relies on cases such as *Marriott* v. *National Mutual Casualty Co.*, 195 F.2d 462, 466 (10th Cir.);

*Kaplan Trucking Co.* v. *Lavine,* 253 F.2d 254, 256 (6th Cir.) ; and *Thornberry* v. *Oyler Bros., Inc.,* 164 Ohio St. 395, 400, 131 N.E.2d 383.

In the first place, as already noted, the arrangement did not involve a one-way trip lease but a ten-day trip lease at least covering a trip to the eastern seaboard "and return." There can be no question that Wheatley was contractually obligated to return the semitrailer to Ellsworth, and within the ten-day period. Thus the so-called one-way trip lease cases, such, for instance, as *Costello* v. *Smith,* 179 F.2d 715, 717 (2d Cir.), have no application to the situation. A collection of such cases may be found in an annotation in 16 A.L.R.2d 960. Had Wheatley returned directly from Boston to Chicago, whether with a load furnished by Ellsworth in Boston or with the semitrailer empty, Ellsworth would have been liable for any actionable negligence of Wheatley under the rule of cases such as *American Transit Lines* v. *Smith,* 246 F.2d 86, 89 (6th Cir.), relied on in part by the trial court. That case held, in effect, that the franchise rule applied where, under a return-trip lease, a trailer was being hauled, empty, back to the original point of departure. See *Marriott* v. *National Mutual Casualty Co.,* supra.

But the conclusive answer to Ellsworth's claims is found in the terms of the contract between Wheatley and Ellsworth. Wheatley was not merely permitted to return the semitrailer to Chicago within the ten-day period. He was under a contractual duty so to do. He was not merely permitted to get, if he could, a return load for which he was to pay Ellsworth as trailer rental 20 per cent of such freight charge as he made. He was under a duty, by the very terms of the arrangement, to get a return load from Ellsworth if it had one, and if it did

not, to attempt to get one from anyone he could. Pursuant to these instructions, he sought for, and succeeded in obtaining, a load. That load or job was approved by Ellsworth's dispatcher in North Bergen. The court was privileged to find that in transporting the potatoes from Boston to Baltimore Wheatley was carrying out his duties under the original arrangement as implemented by the instructions of Ellsworth's manager in Chicago, its solicitor in Boston, and its dispatcher at its North Bergen terminal. Not only was Wheatley's tractor "in the productive use to the interest of" Ellsworth but it was engaged in the business of Ellsworth, whether or not also in the business of Wheatley. This, by itself, distinguishes this case from that of *Thornberry* v. *Oyler Bros., Inc.*, supra, 400, relied on by Ellsworth. The relationship of Wheatley to Ellsworth, if not that of an employee compensated by a share of the gross revenue from hauling the return cargo, was at least that of an independent contractor engaged in Ellsworth's business, and liability would follow under the franchise rule notwithstanding that the contract creating the relationship was implemented by a lease of the tractor or a rental back of the semitrailer. *Venuto* v. *Robinson,* 118 F.2d 679, 682 (3d Cir.), cert. denied, 314 U.S. 627, 62 S. Ct. 58, 86 L. Ed. 504; *Dealer's Transport Co.* v. *Werner Transportation Co.,* 203 F.2d 549, 554 (8th Cir.). Ellsworth was carrying out, through Wheatley, the activity or business of conveying goods by motor truck, under its common carrier certificate, at some gain to itself, from Boston to Baltimore. Cases involving the liability of a lessor motor carrier, operating under a franchise, for torts of its lessee—the relationship Ellsworth claims for the return trip—are collected in an an-

notation in 34 A.L.R.2d 1121, 1122, § 2. Ellsworth's interstate commerce commission marker was on the tractor and was needed in the performance of the contract for the carriage of the potatoes to Baltimore.

Ellsworth is liable for Wheatley's negligence in the operation of the truck, in whole or in part on Ellsworth's business, and cannot avoid this liability through its arrangement with Wheatley, even if that arrangement made him an independent contractor and was implemented by vehicular leases; there was no error in the court's conclusion to that effect. *Murray* v. *Lehigh Valley R. Co.*, 66 Conn. 512, 519, 34 A. 506; *Kissell* v. *Motor Age Transit Lines, Inc.*, 357 Pa. 204, 209, 53 A.2d 593; *Dealer's Transport Co.* v. *Werner Transportation Co.*, supra, 555. This makes unnecessary the determination whether the conclusion of the court could be supported, apart from any question of the interstate commerce commission certificate, on either of the other two grounds alleged in the complaint. See *Tierney* v. *Correia,* 120 Conn. 140, 145, 180 A. 282; s.c., 123 Conn. 146, 151, 193 A. 201; *Weller* v. *Fish Transport Co.*, 123 Conn. 49, 54, 192 A. 317; notes, 119 A.L.R. 1035, & supplemental annotations; 17 A.L.R.2d 1388, 1416, § 12. It is enough that liability flows from the over-all arrangement which was made by Ellsworth with Wheatley before his departure from Chicago and which required him to attempt to secure a return load instead of merely hauling the semitrailer back empty. Since neither the character of any return load nor its actual destination was foreseeable when Wheatley started out from Chicago, the freight charge for it could not have then been computed. Thus, the percentage allowance was a feasible way of providing for the

respective shares of Wheatley and Ellsworth in the freight charge for any return load Ellsworth itself might have or Wheatley might be able to obtain from someone else.

Ellsworth assigns error in a series of rulings on evidence. Officer Louis Santos of the Norwalk police had investigated the accident shortly after its occurrence. He was called by the plaintiffs as a witness and testified that he found no skid marks at that time but that after daylight the next morning, on his return to the locus, he found scratches on the concrete in the road. He stated that he was not at the scene when the truck was taken away by a wrecker during the night. Over objection, he was allowed to testify as to the scratch marks on the concrete and as to the approximate point of impact as he determined it from those marks. Ellsworth's subsequent motion to strike out this testimony was denied. Ellsworth claims that the evidence was inadmissible because there had been no proper foundation to show that the scratches were made by the truck or, even if they were, that they were not made when the truck was being removed during the night by the wrecker. There had been evidence that the truck had come onto its left side of the road before the impact, had tipped over onto the plaintiffs' car and had carried it back along the highway in the general line of the scratches, and that concrete was found on the truck the next morning. It was not necessary that the plaintiffs prove by evidence equivalent to a mathematical demonstration that the marks had been made by the truck at the time of the accident. It was enough if there was evidence from which it could be found that it was reasonably probable that they had been. *Hennessey* v. *Hennessey,* 145 Conn. 211, 214, 140 A.2d 473. The principle

is well settled, even where the case, unlike this one, is a jury case, that where the admissibility of evidence depends upon a preliminary question of fact, to be determined by the court, its decision is not to be reversed unless there is clear and manifest error. *Williams* v. *Perrotta,* 95 Conn. 529, 533, 111 A. 843; *Kryger* v. *Panaszy,* 123 Conn. 353, 360, 195 A. 795; *Shuchat* v. *Stratford,* 125 Conn. 566, 572, 7 A.2d 387. There was no error in the rulings. *Kissell* v. *Motor Age Transit Lines, Inc.,* 357 Pa. 204, 210, 53 A.2d 593.

Ellsworth has attacked, as found without evidence, findings as to certain elements of damage in the case of three of the plaintiffs. The plaintiffs failed to include in their appendix any evidence supporting these findings. Under our rule, this requires that they be stricken. Practice Book §§ 447, 448; *Sturtevant* v. *Sturtevant,* 146 Conn. 644, 649, 153 A.2d 828. When an appellant assigns as error, and makes the claim in his brief, that a material fact was found without evidence, and does not print the relevant evidence, the burden of printing evidence to show that no error was committed is, under the rule, placed on the appellee. The rule in effect relieves the appellant of the burden, with regard to such an assignment, of showing that there was error, even though logically he should have this burden. The justification for the rule lies in the fact that no other rule is practical or feasible. However, counsel for an appellant should not make a claim of error of this type unless, as an officer of the court, he both actually and reasonably believes that the finding in question was made without evidence. If such a claim is made recklessly or without an actual and reasonable belief that it is factually true, it would be good ground for disciplinary measures.

The frequency with which claims of error of this type are being made has impelled us to point out the ethical considerations involved. In the present case, we have no reason to think that counsel for Ellsworth did not actually and reasonably believe the claims of error to be well taken, nor that they were not in fact well taken. With the elimination of the findings in question, the awards of damages to the plaintiffs Richard and Theresa Engelke and William Bodart cannot stand, since we have no way of knowing to what extent the findings affected those awards. The other claimed errors do not require discussion.

There is error in part; the judgment is affirmed as to the plaintiff Elise Bodart but is set aside as to the plaintiffs Richard Engelke, Theresa Engelke and William Bodart, and as to them a new trial is ordered limited to the question of damages.

In this opinion the other judges concurred.